# UNITED STATES DISTRICT COURT
# DISTRICT OF DISTRICT OF COLUMBIA

RICHARD and TAMMY WITCHER, and
DONNA SLUCK, on behalf of themselves
and all others similarly situated,

**Plaintiffs,**

v.

VOLKSWAGEN A.G. and VOLKSWAGEN
GROUP OF AMERICA, INC., a New Jersey
Corporation,

**Defendant.**

CASE NO. __15-1618_____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Richard and Tammy Witcher, and Donna Sluck ("Plaintiffs"), individually and
on behalf of all others similarly situated (collectively, the "Class"), sue Defendants Volkswagen
A.G. and Volkswagen Group of America, Inc. (collectively "Defendants" or "Volkswagen") and
allege:

## <u>FACTUAL ALLEGATIONS</u>

1.      On September 19, 2015, consumers throughout the United States first learned
that, for nearly a decade, one of the most widely-recognized and respected automobile
companies in the world had marketed and sold hundreds of thousands of cars based on a
wholesale lie.  Motivated by greed and avarice, Defendants installed sophisticated software in
Volkswagen and Audi diesel vehicles sold in the United States that was designed to circumvent
and artificially suppress the results of official vehicle emissions testing.  This software, known
as a "defeat device," results in cars that meet emissions standards in the laboratory or state
testing station but, during normal operation, actually emit nitrogen oxides (NOx) at up to 40

1

times the standard allowed under United States laws and regulations. The "defeat device" produced and used by Defendants is prohibited under the U.S. Clean Air Act. By installing such software in hundreds of thousands of vehicles sold in his country over the past decade, Defendants were able to falsely claim that such cars enjoyed extremely high fuel mileage coupled with low emissions, enabling Defendants to sell these cars for thousands of dollars more than comparable automobiles, and thereby generating billions of dollars in ill-gotten gains for Defendants. A few days later, it was revealed that Defendants' fraudulent conduct actually involved nearly 11 million cars sold throughout the world, including approximately 500,000 cars sold in the United States. Through this action, Plaintiffs and the Class seek to hold Defendants accountable for their intentional misconduct.

2.       The United States Government, through the Environmental Protection Agency, has passed and enforced laws designed to protect United States citizens from pollution and in particular, certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these US laws and must adhere to EPA rules and regulations. This case arises because Defendants Volkswagen AG and Volkswagen Group of America (collectively "Volkswagen") purposeful and intentionally breached the laws of the United States and the rules and regulations of the EPA by selling in the United States vehicles manufactured by its affiliates Volkswagen AG and Audi AG that purposefully evaded federal and state laws. As stated by Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA: "Using a defeat device in cars to evade clean air standards is illegal and a threat to public health." Yet that is exactly what Volkswagen did in its 2009-20015 Volkswagen and Audi diesel vehicles.

3.       As detailed in the EPA's Notice of Violation ("NOV"), sophisticated software in the Volkswagen and Audi diesel vehicles sold by Defendant Volkswagen in the United States detects when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test. But otherwise, that is at all other times that the vehicle is

running, the emissions controls are suppressed. This results in cars that meet emissions standards in the laboratory or state testing station, but during normal operation emit nitrogen oxides (NOx) at up to 40 times the standard allowed under United States laws and regulations.  The software produced and used by Volkswagen is a "defeat device" as defined by the Clean Air Act.

4.      NOx pollution contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter.  Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illness serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects.  Children, the elderly, and people with pre- existing respiratory illness are at acute risk of health effects from these pollutants.

5.      The Clean Air Act has strict emissions standards for vehicles and it requires vehicle manufacturers to certify to EPA that the vehicles sold in the United States meet applicable federal emissions standards to control air pollution.  Every vehicle sold in the United States must be covered by an EPA issued certificate of conformity.  Under federal law, cars equipped with defeat devices, which reduce the effectiveness of emissions control system during normal driving conditions, cannot be certified.  By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions that were certified to EPA, Volkswagen violated the Clean Air Act, defrauded its customers, and engaged in unfair competition under state and federal law.

6.      According to the EPA NOV, Volkswagen installed its "defeat device" in at least the following diesel models of its vehicles (the "Affected Vehicles"): Model Year ("MY") 2009-2015 VW Jetta; MY 2009-2015 VW Beetle; MY 2009-2015 VW Golf; MY 2014-2015 VW Passat; and MY 2009-2015 Audi A3.  Discovery may reveal that additional vehicle models and

model years are properly included as Affected Vehicles.

7.      Volkswagen has charged a substantial premium for the Affected Vehicles, ironically marketed by Volkswagen as "CleanDiesel."  For example, for the 2015 Volkswagen Jetta, the base S model has a starting MSRP of $18,780.  The base TDI S CleanDiesel, however, has a starting MSRP of $21,640, a price premium of $2,860.  The CleanDiesel premium for the highest trim Jetta model is substantially higher: The highest level gas Jetta SE has a starting MSRP of $20,095, while the CleanDiesel TDI SEL MSRP is $26,410, a staggering $6,315 premium.

8.      These premiums occur across all of the vehicles in which Volkswagen installed its "defeat device" for emissions testing.  The table below sets forth the price premium for each base, mid-level and top-line trim for each affected model:

### CleanDiesel Price Premiums

| Model | Base | Mid-level | Top-line |
|-------|------|-----------|----------|
| *VW Jetta* | $2,860 | $4,300 | $6,315 |
| *VW Beetle* | $4,635 | n/a | $2,640 |
| *VW Golf* | $2,950 | $1,000 | $1,000 |
| *VW Passat* | $5,755 | $4,750 | $6,855 |
| *Audi A3* | $2,805 | $3,095 | $2,925 |

9.      Volkswagen has been ordered by the EPA to recall the Affected Vehicles and repair them so that they comply with EPA emissions requirements at all times during normal operation. However, Volkswagen will not be able to make the Affected Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and their efficiency.  As a result, even if Volkswagen is able to make Class

members' Affected Vehicles EPA compliant, Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised.  This will necessarily result in a diminution in value of every Affected Vehicle and it will cause owners of Affected Vehicles to pay more for fuel while using their affected vehicles.

10.     As a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Affected Vehicles emit 40 times the allowed levels, owners and/or lessees of the Affected Vehicles have suffered losses in money and/or property.  Had Plaintiffs and Class members known of the "defeat device" at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.  Moreover, when and if Volkswagen recalls the Affected Vehicles and degrades the CleanDiesel engine performance in order to make the Affected Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased.  Moreover, affected vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency.

11.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of Affected Vehicles.  Plaintiffs seek damages, injunctive relief, and equitable relief for the conduct of Volkswagen related to the "defeat device," as alleged in this complaint.

## JURISDICTION

12.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in

controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

13.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' and the Class's claims occurred in this District, including Volkswagen's marketing, advertising, selling and leasing of the Affected Vehicles within this District.

## PARTIES

### A.    Plaintiffs

14.    Plaintiffs Richard and Tammy Witcher are citizens of the State of Maryland. In 2010, Plaintiffs Witcher purchased a new 2010 Volkswagen Jetta Sportwagen, with VIN # 3VWTL7AJ0AM637695, from Antwerpen Volkswagen, an authorized Volkswagen dealer in Pasadena, Maryland.  Plaintiffs Witcher purchased, and still own, this car.  Unknown to Plaintiffs Witcher, at the time they purchased this car, it was equipped with an emissions control "defeat device" that caused the car to get an undue EPA certification and pass emissions tests, but at all other times emit 40 times the allowed level of pollutants, including NOx.  The use of the "defeat device" by Volkswagen has and will cause Plaintiffs Witcher out-of-pocket loss, future attempted repairs, and diminished value of their car.  Volkswagen knew about and intentionally used the "defeat device," but did not disclose the "defeat device" and its effects to Plaintiffs Witcher, so Plaintiffs Witcher purchased their car on the reasonable belief that it complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

6

15.     Plaintiffs Witcher selected and ultimately purchased this car, in large part, because of the "CleanDiesel" system, as represented through standardized advertisements and representations made by Volkswagen to Plaintiffs Witcher and all consumers throughout the United States. It was the first car they purchased with a diesel engine.   None of the advertisements reviewed or representations received by Plaintiffs Witcher contained any disclosure relating to the "defeat device" or that Volkswagen had purposefully falsified its certification of EPA compliance.  Had Volkswagen disclosed that the CleanDiesel in this car actually emitted 40 times the permitted levels of pollutants, including NOx, Plaintiffs Witcher would not have purchased this car with the CleanDiesel engine, or would have paid less for the car.

16.     Plaintiff Donna Sluck is a citizen of the State of Virginia.  On or about October 2011, Plaintiff Sluck purchased a new 2012 Volkswagen Passat TDI, with VIN # 1VWCN7A38CC005124 from Lindsay Volkswagen, an authorized Volkswagen dealer in Sterling, Virginia.  Plaintiff Sluck purchased, and still owns, this car.  Unknown to Plaintiff Sluck, at the time she purchased this car, it was equipped with an emissions control "defeat device" that caused his car to get an undue EPA certification and pass emissions tests, but at all other times emit 40 times the allowed level of pollutants, including NOx.  The use of the "defeat device" by Volkswagen has and will cause Plaintiff Sluck out-of-pocket loss, future attempted repairs, and diminished value of her car.  Volkswagen knew about and intentionally used the "defeat device," but did not disclose the "defeat device" and its effects to Plaintiff Sluck, so Plaintiff Sluck purchased this car on the reasonable belief that it complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

17.     Plaintiff Sluck selected and ultimately purchased this car, in large part, because of the "CleanDiesel" system, as represented through standardized advertisements and representations made by Volkswagen to Plaintiff Sluck and all consumers throughout the United States. It was the first car she purchased with a diesel engine.  None of the advertisements reviewed or representations received by Plaintiff Sluck contained any disclosure relating to the "defeat device" or that Volkswagen had purposefully falsified its certification of EPA compliance.  Had Volkswagen disclosed that the CleanDiesel in this car actually emitted 40 times the permitted levels of pollutants, including NOx, she would not have purchased this car with the CleanDiesel engine, or would have paid less for the car.

18.     Plaintiffs have and will suffer an ascertainable loss as a result of Volkswagen's omissions and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of their cars.

19.     Neither Volkswagen nor any of its agents, dealers, or other representatives informed Plaintiffs of the existence of the "defeat device" and/or defective design of the CleanDiesel engine prior to purchase.

**B.     Defendants**

20.     Volkswagen AG is a foreign corporation with its principal place of business located in Wolfsburg, Germany.   Volkswagen AG is one of the world's largest car manufacturers.  It owns and controls the brand names Volkswagen, Rolls-Royce, Bentley, Audi, Lamborghini, Skoda and Seat.   Volkswagen AG designs, manufactures, tests, markets, distributes and sells the Affected Vehicles.  Volkswagen AG delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in all 50 United

States.

21.      Volkswagen Group of America, Inc. is a corporation doing business in all 50 states (as well as the District of Columbia) and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.  At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased and warranted the Affected Vehicles under the Volkswagen and Audi brand names throughout the United States.  Volkswagen and/or its agents designed, manufactured, and installed the CleanDiesel engine systems in the Affected Vehicles, which included the "defeat device." Volkswagen also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.      Discovery Rule Tolling

22.      Class members had no way of knowing about Volkswagen's deception with respect to its CleanDiesel engine system and "defeat device."  It took federal EPA investigations to uncover Volkswagen's deception, which involved sophisticated software manipulation on Volkswagen's part.  Volkswagen was intent on expressly hiding its behavior from regulators and consumers.  This is the quintessential case for tolling.

23.      Within the time period of any applicable statutes of limitation, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing the conduct complained of herein and misrepresenting the Company's true position with respect to the emissions qualities of its vehicles.

24.      Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Volkswagen did not report

information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Volkswagen had information in its possession about the existence of its sophisticated emissions scheme and that it opted to conceal that information, which was discovered by Plaintiffs only shortly before this action was filed.  Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust that Plaintiffs and other Class members had placed in its representations, or that, necessarily, Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of the emissions, and the emissions software, of its vehicles, or of Volkswagen's emissions scheme.

25.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**B.    Fraudulent Concealment Tolling**

26.    All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

27.    Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the subject vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

**C.    Estoppel**

28.    Volkswagen was under a continuous duty to disclose to Plaintiffs and the other

Class members the true character, quality, and nature of emissions from the vehicles at issue, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

29.     Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions, of the vehicles at issue.

30.     Volkswagen was also under a continuous duty to disclose to Plaintiffs and Class members that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air standards, and that it systematically devalued compliance with, and deliberately flouted, federal and state law regulating vehicle emissions and clean air.

31.     Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

32.     Plaintiffs bring this action as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

**The Nationwide Class**

All persons or entities in the United States who are current or former owners and/or lessees of an "Affected Vehicle."  Affected Vehicles include, without limitation: MY 2009-2015 VW Jetta; MY 2009-2015 VW Beetle; MY 2009-2015 VW Golf; MY 2014-2015 VW Passat; and MY 2009-2015 Audi A3.

**The Maryland Subclass**

All persons or entities in the state of Maryland who are current or former owners and/or lessees of an "Affected Vehicle."  Affected Vehicles include, without limitation: MY 2009-2015 VW Jetta; MY 2009-2015 VW Beetle; MY 2009-2015 VW Golf; MY 2014-

2015 VW Passat; and MY 2009-2015 Audi A3.

**The Virginia Subclass**

All persons or entities in the state of Virginia who are current or former owners and/or lessees of an "Affected Vehicle."  Affected Vehicles include, without limitation: MY 2009-2015 VW Jetta; MY 2009-2015 VW Beetle; MY 2009-2015 VW Golf; MY 2014-2015 VW Passat; and MY 2009-2015 Audi A3.

33.     Excluded from the Class are Volkswagen and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

34.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

35.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

36.     <u>Numerosity.</u>  Federal Rule of Civil Procedure 23(a)(1):  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are hundreds of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Volkswagen's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

37.     <u>Commonality and Predominance:</u>  Federal Rule of Civil Procedure 23(a)(2) and

23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.  Whether Volkswagen engaged in the conduct alleged herein;

    b.  Whether Volkswagen designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

    c.  Whether the CleanDiesel engine system in the Affected Vehicles contains a defect in that it does not comply with US EPA requirements;

    d.  Whether the CleanDiesel engine systems in Affected Vehicles can be made to comply with EPA standards without substantially degrading the performance and/or efficiency of the Affected Vehicles;

    e.  Whether Volkswagen knew about the "defeat device" and, if so, how long Volkswagen has known;

    f.  Whether Volkswagen designed, manufactured, marketed, and distributed Affected Vehicles with a "defeat device";

    g.  Whether Volkswagen's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

    h.  Whether Plaintiffs and the other Class members overpaid for their Affected Vehicles;

    i.  Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

    j.  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

38.     <u>Typicality:</u>     Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Volkswagen's wrongful conduct as described above.

39.     <u>Adequacy:</u>     Federal Rule of Civil Procedure 23(a)(4):   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.   The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

40.     <u>Declaratory and Injunctive Relief:</u>   Federal Rule of Civil Procedure 23(b)(2): Volkswagen has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

41.     <u>Superiority:</u>   Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.   The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Volkswagen, so it would be impracticable for Nationwide, Maryland Subclass members and Florida Subclass members to individually seek redress for Volkswagen's wrongful conduct.   Even if Class members could afford individual litigation, the court system could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.   By contrast,

14

the class action device presents far fewer management difficulties, and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### I.   Nationwide Claims

### COUNT I

### Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(c)

42.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

43.     Defendants are "persons" under 18 U.S.C. § 1961(3).

44.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs

of a RICO enterprise through a pattern of racketeering activity.

45.     Plaintiffs and Class members are "person[s] injured in his or her business or

property" by reason of the Defendants' violation of RICO within the meaning of 18 U.S.C. §

1964(c).

46.     The following persons, and others presently unknown, have been members of and

constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to

herein collectively as the Volkswagen RICO Enterprise:

    a.   Volkswagen, who designed, manufactured, and sold hundreds of thousands of

       Affected Vehicles knowing that they contained the illegal defeat devices, the scope

       and nature of which they concealed from and misrepresented to the public and

       regulators for more than a decade and still refuse to entirely acknowledge.

    b.   Volkswagen's officers, executives, and engineers, who have collaborated and

       colluded with each other and with other associates in fact in the Volkswagen RICO

       Enterprise to deceive Plaintiffs and Class members into purchasing defective

       vehicles, and actively concealing the illegal defeat devices from Plaintiffs and Class

members.

      c.     Dealerships that sell vehicles manufactured by Volkswagen, which sold or leased the Affected Vehicles containing illegal "defeat devices" to Plaintiffs and Class Members.

47.     The Volkswagen RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Volkswagen RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

48.     While Volkswagen participated in the conduct of the Volkswagen RICO Enterprise, they had an existence separate and distinct from the Volkswagen RICO Enterprise. Further, the Volkswagen RICO Enterprise was separate and distinct from the pattern of racketeering in which Volkswagen has engaged.

49.     At all relevant times, Defendants operated, controlled or managed the Volkswagen RICO Enterprise, through a variety of actions. Volkswagen's participation in the Volkswagen RICO Enterprise was necessary for the successful operation of its scheme to defraud because Volkswagen manufactured the Affected Vehicles, concealed the nature and scope of the "defeat devices," and profited from such concealment.

50.     The members of the Volkswagen RICO Enterprise all served a common purpose: to sell as many vehicles containing such "defeat devices," as possible, and thereby maximize the revenue and profitability of the Volkswagen RICO Enterprise's members. The members of the Volkswagen RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the Volkswagen RICO Enterprise benefited from the common purpose: Defendants sold more

Affected Vehicles than they would have otherwise had the scope and nature of the "defeat devices" not been concealed; and the dealerships sold and serviced more Affected Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the "defeat devices" from Plaintiffs and Class members.

51.     Defendants conducted and participated in the conduct of the affairs of the Volkswagen RICO Enterprise through a pattern of racketeering activity, beginning no later than 2009 and continuing to this day, that consists of numerous and repeated violations of the federal mail and wire fraud statutes. These statutes prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

52.     For Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the illegal defeat devices found in hundreds of thousands of Affected Vehicles in this country – and millions worldwide – in order to sell more vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with repairing the defects. By concealing the scope and nature of the illegal "defeat devices" in the Affected Vehicles, Defendants also maintained and boosted consumer confidence in the "clean diesel" campaign, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped Defendants sell more vehicles than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

53.     As detailed above, Defendants were well aware of the "defeat devices," but intentionally subjected Plaintiffs and Class Members to those defects in order to maximize their profits. Moreover, once the defect became known, Defendants failed to adequately remedy the defect: pollution emissions were still too high.

54.     To further the scheme to defraud, Defendants repeatedly misrepresented and concealed the nature and scope of the "defeat devices" defect. Defendants passed off a substandard

17

recall but failed to adequately remedy the defect.

55.     To further the scheme to defraud, Defendants concealed the nature and scope of the "defeat devices" defect from federal regulators, enabling it to escape investigation and costs associated with recalls and corrective action.

56.     To further the scheme to defraud, Defendants would promote and tout the reliability, and quality of the vehicles while simultaneously concealing the nature and scope of the "defeat devices" defect.

57.     To further the scheme to defraud, Defendants permitted or caused the dealerships to promote the reliability, and quality of the purported eco-friendly nature of the Affected Vehicles while simultaneously concealing the nature and scope of the "defeat devices" defect.

58.     To carry out, or attempt to carry out the scheme to defraud, Defendants conducted or participated in the conduct of the affairs of the Volkswagen RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

    a.  Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Volkswagen website, communications with the EPA and/or CARB statements to the press, and communications with other members of the Volkswagen RICO Enterprise, as well as advertisements and other communications to Volkswagen customers, including Plaintiff and Class members. Given that each Affected Vehicle required a COC application, Volkswagen used the mail and wires 30 times, at minimum, to submit the fraudulent COC applications; and

    b.  Defendants utilized the interstate and international mail and wires for the purpose of

18

obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

59.     Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included transmitting or causing to be transmitted, by means of mail and wire communication traveling in interstate or foreign commerce, between its offices in Germany, Virginia, or among other offices in the United States: communications concerning the illegal "defeat devices"; and submissions to the EPA regarding COC applications for each model and year of the Affected Vehicles that failed to adequately disclose or address all auxiliary emission control devices that were installed in the Affected Vehicles.

60.     Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and Class members were directly harmed as a result of Defendants' intentional conduct. Plaintiffs, Class members, and federal regulators, among others, relied on Defendants' material misrepresentations and omissions.

61.     Defendants engaged in a pattern of related and continuous predicate acts beginning at least in 2009. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and Class members and obtaining significant monies and revenues from them while providing Affected Vehicles worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

62.     The predicate acts all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiffs and Class Members. The predicate acts were committed or caused to be committed by Defendants through their participation in the Volkswagen RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with

remediating the defect.

63.     By reason of and as a result of the conduct of Defendants, and in particular its pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

    a.  purchasing or leasing Affected Vehicles that Plaintiffs and Class members would not otherwise have purchased or leased;

    b.  overpaying for leased or purchased Affected Vehicles, in that Plaintiffs and Class members believed they were paying for "green" eco-friendly vehicles but obtaining vehicles that were neither "green" nor eco-friendly; and

    c.  purchasing Affected Vehicles of diminished value, thus reducing their residual and/or resale value.

64.     Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

65.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

66.     Plaintiffs bring this claim against Defendants on behalf of members of the Nationwide Class.

67.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

68.     The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

69.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

70.     Defendants are a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

71.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

72.     Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).   As a part of the implied warranty of merchantability, Defendants warranted that the Affected Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

73.     Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Defendants have admitted that the Affected Vehicles are defective.

74.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the Affected Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Affected Vehicles is null and void.

75.     Any limitations on the warranties are procedurally unconscionable.   There was unequal bargaining power between Defendants, on the one hand, and Plaintiffs and the other Class members, on the other.

76.     Any limitations on the warranties are substantively unconscionable.  Defendants knew that the Affected Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose the "defeat device" to Plaintiffs and the other Class members. Thus, Defendants' attempted enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

77.     Plaintiffs and each of the other Class members have had sufficient direct dealings with Defendants or its agents (dealerships) to establish privity of contract.

78.     Privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and its dealers, and specifically, of the implied warranties.  The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit consumers.

79.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

80.     Furthermore, affording Defendants an opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Affected Vehicle, Defendants knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Affected Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be

inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

81.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Affected Vehicles by retaining them.

82.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

83.     Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have and will incurred in attempting to rectify the defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

84.     The right of Plaintiffs and Class members to recover these expenses as an

equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT III
## Fraudulent Concealment

85.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

86.     Plaintiffs bring this claim under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.   In the alternative, Plaintiffs bring this claim under Virginia law, because Virginia has the most significant relationship to the issues and facts relevant to this claim.   In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Affected Vehicles.

87.     Defendants intentionally concealed and suppressed material facts concerning the quality of the Affected Vehicles.   Notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Defendants engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog.   The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road.   The result was what Defendants' intended: vehicles passed emissions certifications by way of deliberately induced false readings.   Defendants' deliberate, secret scheme also reportedly resulted in noxious

emissions from these vehicles at 40 times applicable standards.

88.     Plaintiffs and Class members reasonably relied upon Defendants' false representations.  They had no way of knowing that Defendants' representations were false and gravely misleading.  As alleged herein, Defendants employed extremely sophisticated methods of deception.  Plaintiffs and Class members did not, and could not, unravel Defendants' deception on their own.

89.     Defendants concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air law, and emissions regulations that are meant to protect the public and consumers.  It also emphasized profits and sales about the trust that Plaintiffs and Class members placed in its representations.

90.     Defendants also took steps to ensure that their employees did not reveal the details of its scheme to regulators or consumers, including Plaintiffs and Class members. Defendants did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of their vehicles, including certified previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air law and emissions regulations, and that their vehicles likewise comply with applicable law and regulations.  Defendants false representations were material to consumers, both because they concerned the quality of the affected vehicles, including their compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As Defendants well knew, their customers, including Plaintiffs and Class members, highly valued that the vehicles they were purchasing or leasing were *clean* diesel cars, and they paid accordingly.

25

91.     Defendants had a duty to disclose the emissions scheme they engaged in with respect to the vehicles at issue because knowledge of the scheme and its details were known and/or accessible only to Defendants, because Defendants had exclusive knowledge as to implementation and maintenance of this scheme, and because Defendants knew the facts were not known to or reasonably discoverable by Plaintiffs or Class members.  Defendants also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as *clean* diesel cars, or cars with *clean* diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the emissions scheme, the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs, Defendants had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and Class members.  Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. Defendants represented to Plaintiffs and Class members that they were purchasing *clean* diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Defendants had subverted the testing process thoroughly.

92.     Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles did not or

could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and it did so at the expense of Plaintiffs and Class members.

93.     On information and belief, Defendants have still not made full and adequate disclosures, and continues to defraud Plaintiffs and Class members by concealing material information regarding the emissions qualities of the Affected Vehicles and the emissions scheme.

94.     Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Class Members' actions were justified.  Defendants were in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs or Class members.

95.     Because of the concealment and/or suppression of the facts, Plaintiffs and Class members have and will sustain damage because they own vehicles that are diminished in value as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions and Defendants' failure to timely disclose the actual emissions qualities and quantities of hundreds of thousands of Volkswagen and Audi-branded vehicles and the serious issues endangered by Defendants' corporate policies.  Had Plaintiffs and Class members been aware of Defendants' emissions schemes with regard to the Affected Vehicles, and the Defendants' callous disregard for compliance with applicable federal and state law and regulations, Plaintiffs and Class members who purchased or leased new or certified previously-owned vehicles would

have paid less for their vehicles or would not have purchased or leased them at all.

96.     The value of Plaintiffs' and Class Members' vehicles has diminished as a result of Defendants' fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen and Audi brand names attached to Plaintiffs' and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

97.     Accordingly, Defendants' are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

98.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Defendants made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV
## Breach of Implied Warranty

99.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

100.    Volkswagen is a "merchant" within the meaning of Va. Code Ann. § 8.2-314.

101.    A warranty that the Affected Vehicles were in merchantable condition was implied by law, pursuant to Va. Code Ann. § 8.2-314.

102.    A warranty that goods shall be merchantable and fit for ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant of goods of that kind.

103.    Defendants breached the implied warranty of merchantability because the

Affected Vehicles were not fit for the ordinary purposes for which such vehicles are used. Specifically, the Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

104.    Defendants received timely notice of the breach, but have failed to pay for, or offer to pay for, any of the associated repair or replacement costs.

105.    Plaintiffs and the other Class members have had sufficient direct dealings with Defendants and/or their agents (dealerships) to establish privity of contract between Plaintiffs and the other Class members. Notwithstanding this, privity is not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers; specifically, they are the intended beneficiaries of Volkswagen's implied warranties. The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

106.    Plaintiffs and the Class members sustained injuries and damages as a proximate result of the Defendants' breach of warranty.

**COUNT V**
**Breach of Contract**

107.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

108.    Plaintiffs bring this claim under the common law of breach of contract, as there are no true conflicts (case-dispositive differences) among various states' laws of breach of

contract. In the alternative, Plaintiffs bring this claim under Virginia law, because Virginia has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Affected Vehicles.

109. Defendants' misrepresentations and omissions alleged herein, including the failure to disclose the existence of the "defeat device" and/or defective design as alleged herein, caused Plaintiffs and the other Class members to make their purchases or leases of their Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Affected Vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and the "defeat device." Accordingly, Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

110. Each and every sale or lease of an Affected Vehicle constitutes a contract between Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing Plaintiffs and the other Class members defective Affected Vehicles and by misrepresenting or failing to disclose the existence of the "defeat device" and/or defective design, including information known to Defendants rendering each Affected Vehicle less safe and emissions compliant, and thus less valuable, than vehicles not equipped with CleanDiesel engine systems and "defeat devices."

111. As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages

allowed by law.

<h1 style="text-align:center">COUNT VI<br>Unjust Enrichment</h1>

112.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

113.     Plaintiffs bring this claim under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.   In the alternative, Plaintiffs bring this claim under Virginia law, because Virginia has the most significant relationship to the issues and facts relevant to this claim.   In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Affected Vehicles.

114.     Defendants received and retained a benefit from the Plaintiffs and inequity has resulted.

115.     Defendants benefitted through its unjust conduct, by selling the Affected Vehicles, at a profit, for more than these Defective Vehicles were worth, to Plaintiffs, who overpaid for these Affected Vehicles, and/or would not have purchased these Affected Vehicles at all; and who have been forced to pay other costs

116.     It is inequitable for Defendants to retain these benefits.

117.     Plaintiffs and Class members do not have an adequate remedy at law.

118.     As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**II.     State Subclass Claims**

### A. Claims Brought on Behalf of the Maryland Subclass

<h1 style="text-align:center">COUNT VII<br>Violation of the Maryland Consumer Protection Act<br>Md. Code, Comm. Law §§ 13-301, <i>et seq.</i></h1>

31

119.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

120.    This count is brought by Plaintiffs Witcher individually on behalf of the putative Maryland class members.

121.    The Maryland Consumer Protect Act (MCPA) states, in relevant part: "A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) The sale… of any consumer goods…; [and/or] (2) The offer for sale… of consumer goods." Md. Code, Com. Law § 13-303.

122.    Plaintiffs Witcher, the Maryland Subclass, and Defendants are "persons" within the meaning of the MCPA, Md. Code Ann., Comm. Law § 13-101(h).

123.    By failing to disclose and actively concealing the truth about the Affected Vehicles and/or the "defeat device" installed in them, Defendants engaged in deceptive trade practices prohibited by the Maryland CPA.

124.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Affected Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

125.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

126.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the "defeat device" discussed above.

127.    Defendants' unfair or deceptive acts or practices, including these concealments,

32

omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs Witcher and members of the Maryland Subclass, about the "defeat device", the quality of Volkswagen's brand, and the true value of the Affected Vehicles.

128. Defendants intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs Witcher and the Maryland Subclass.

129. Defendants knew or should have known that their conduct violated the MCPA.

130. As alleged above, Defendants made material statements about the Affected Vehicle that were either false or misleading.

131. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the truth about the Affected Vehicles, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Affected Vehicles.

132. Defendants owed Plaintiff Powell and the Maryland Subclass a duty to disclose the truth about the Affected Vehicles because Defendants:

    a. possessed exclusive knowledge of the risks posed by the foregoing;

    b. intentionally concealed the foregoing from Plaintiff Powell and the Maryland Subclass; and/or

    c. made incomplete representations about the reliability of the foregoing generally, while purposefully withholding material facts from PlaintiffsWitcher and the Maryland Sublcass that contradicted these representations.

133. Because Defendants fraudulently concealed the "defeat device" installed in the Affected Vehicles, resulting in a raft of negative publicity once the truth finally began to be disclosed, the value of the Affected Vehicles has greatly diminished. In light of the stigma

33

attached to Affected Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

134.    Defendants' failure to disclose and active concealment the "defeat device" was material to Plaintiffs Witcher and the Maryland Subclass.  A vehicle made by a reputable manufacturer of vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of vehicles that conceals defects rather than promptly remedies them.

135.    Plaintiffs Witcher and the Maryland Subclass suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the "defeat device", Plaintiffs Witcher and other Maryland Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs Witcher and members of the Maryland Subclass did not receive the benefit of their bargain as a result of Defendants' misconduct.

136.    Defendants' violations present a continuing risk to Plaintiffs Witcher, the Maryland Subclass, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

137.    As a direct and proximate result of Defendants' violations of the MCPA, Plaintiffs Witcher and the Maryland Subclass have suffered injury-in-fact and/or actual damage.

138.    Plaintiffs Witcher and the Maryland Subclass seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, damages, disgorgement, restitution, attorneys' fees, and any other just and proper relief available under the Maryland CPA per Md. Code Ann., Comm. Law § 13-301.

## COUNT VIII
### Breach of Implied Warranty of Merchantability
### Md. Code Ann., Comm. Law § 2-314, *et seq.*

139.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

140.    Volkswagen is a "merchant" within the meaning of Md. Code Ann., Law § 2-314.

141.    A warranty that the Affected Vehicles were in merchantable condition was implied by law, pursuant to Md. Code Ann., Law § 2-314.

142.    A warranty that goods shall be merchantable and fit for ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant of goods of that kind.

143.    Defendants breached the implied warranty of merchantability because the Affected Vehicles were not fit for the ordinary purposes for which such vehicles are used. Specifically, the Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

144.    Defendants received timely notice of the breach, but have failed to pay for, or offer to pay for, any of the associated repair or replacement costs.

145.    Plaintiffs Witcher and the Maryland Subclass have had sufficient direct dealings with Defendants and/or their agents (dealerships) to establish privity of contract between Plaintiffs Witcher and the Maryland Subclass. Notwithstanding this, privity is not required in this case because Plaintiffs Witcher and the Maryland Subclass are intended third-party beneficiaries of contracts between Defendants and their dealers; specifically, they are the intended beneficiaries of Defendants implied warranties. The dealers were not intended to be the ultimate

consumers of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

146.    Plaintiffs Witcher and the Maryland Subclass sustained injuries and damages as a proximate result of Defendants' breach of warranty.

**B. Claims Brought on Behalf of the Virginia Subclass**

**COUNT IX**
**Violation of the Virginia Consumer Protection Act**
**Va. Code Ann. §§ 59-196, *et seq.***

147.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

148.    This cause of action is brought pursuant to Virginia's Consumer Protection Act, Va. Code §§ 59.1-196, *et seq.* ("VCPA")

149.    Under the VCPA, "supplier" means "a seller, lessor or licensor who advertises, solicits or engages in consumer transactions, or a manufacturer, distributor or licensor who advertises and sells, leases or licenses goods or services to be resold, leased or sublicensed by other persons in consumer transactions."

150.    Defendants are "suppliers" under the VCPA.

151.    Under the VCPA, "consumer transaction" means "the advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."

152.    The sale of the Affected Vehicles to the Class members was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

153.    The VCPA prohibits "deceptive trade practices." Va. Code Ann. § 59.1-198.

154.    The VCPA also declares as "unlawful" practices such as "[u]sing any other

36

deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

155.    By failing to disclose and actively concealing the truth about the Affected Vehicles and/or the "defeat device" installed in them, Defendants engaged in unlawful trade practices prohibited by the VCPA.

156.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Affected Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

157.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

158.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the "defeat device" discussed above.

159.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff Sluck and members of the Virginia Subclass, about the "defeat device", the quality of Volkswagen's brand, and the true value of the Affected Vehicles.

160.    Defendants intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiff Sluck and the Virginia Subclass.

161.    Defendants knew or should have known that their conduct violated the Virginia CPA.

162.    As alleged above, Defendants made material statements about the Affected Vehicle that were either false or misleading.

163.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the truth about the Affected Vehicles, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Affected Vehicles.

164.    Defendants owed Plaintiff Sluck and the Virginia Subclass a duty to disclose the truth about the Affected Vehicles because Defendants:

      d.   possessed exclusive knowledge of the risks posed by the foregoing;

      e.   intentionally concealed the foregoing from Plaintiff Powell and the Virginia Subclass; and/or

      f.   made incomplete representations about the reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff Sluck and the Virginia Sublcass that contradicted these representations.

165.    Because Defendants fraudulently concealed the "defeat device" installed in the Affected Vehicles, resulting in a raft of negative publicity once the truth finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to Affected Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

166.    Defendants' failure to disclose and active concealment the "defeat device" was material to Plaintiff Sluck and the Virginia Subclass.  A vehicle made by a reputable manufacturer of vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of vehicles that conceals defects rather than promptly remedies them.

167.    Plaintiff Sluck and the Virginia Subclass suffered ascertainable loss caused by

Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the "defeat device", Plaintiff Sluck and other Virginia Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiff Sluck and members of the Virginia Subclass did not receive the benefit of their bargain as a result of Defendants' misconduct.

168.    Defendants' violations present a continuing risk to Plaintiff Sluck, the Virginia Subclass, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

169.    As a direct and proximate result of Defendants' violations of the Virginia CPA, Plaintiff Sluck and the Virginia Subclass have suffered injury-in-fact and/or actual damage.

170.    Pursuant to Va. Code Ann. § 59.1-204, Plaintiff Sluck and the Virginia Subclass seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for Plaintiff Powell and each Virginia Subclass member. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Virginia Subclass member, the greater of (a) three times actual damages or (b) $1,000.

171.    Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq.*

**COUNT X**
**Breach of Implied Warranty of Merchantability**
**Va. Code Ann § 8.2-314**

172.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above.

173.     Volkswagen is a "merchant" within the meaning of Va. Code Ann. § 8.2-314.

174.     A warranty that the Affected Vehicles were in merchantable condition was implied by law, pursuant to Va. Code Ann. § 8.2-314.

175.     A warranty that goods shall be merchantable and fit for ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant of goods of that kind.

176.     Defendants breached the implied warranty of merchantability because the Affected Vehicles were not fit for the ordinary purposes for which such vehicles are used. Specifically, the Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

177.     Defendants received timely notice of the breach, but have failed to pay for, or offer to pay for, any of the associated repair or replacement costs.

178.     Plaintiff Sluck and the Virginia Subclass have had sufficient direct dealings with Defendants and/or their agents (dealerships) to establish privity of contract between Plaintiff Sluck and the Virginia Subclass. Notwithstanding this, privity is not required in this case because Plaintiff Sluck and the Virginia Subclass are intended third-party beneficiaries of contracts between Defendants and their dealers; specifically, they are the intended beneficiaries of Defendants implied warranties. The dealers were not intended to be the ultimate consumers of

the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

179. Plaintiff Sluck and the Virginia Subclass sustained injuries and damages as a proximate result of Defendants' breach of warranty.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, demand judgment in their favor and against Defendants as follows:

A. Certification of the proposed Nationwide Class, Maryland Subclass and Virginia Subclass, including appointment of Plaintiffs' counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Injunctive relief in the form of a recall or free replacement program;

D. Damages, restitution, costs,, including punitive damages, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Respectfully submitted,

October 2, 2015

_____
Hassan A. Zavareei
D.C. Bar No. 456161
Jonathan Tycko
D.C. Bar No. 445851
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 L Street N.W., Suite 808
Washington, DC  20036
Telephone: (202) 973-0900
Facsimilie:  (202) 973-0950 (fax)

/s/ Michael E. Criden
Michael E. Criden
(*pro hac vice* forthcoming)
mcriden@cridenlove.com
**CRIDEN & LOVE, P.A.**
7301 Southwest 57 Court
Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050

/s/ Scott P. Schlesinger
Scott P. Schlesinger
(*pro hac vice* forthcoming)
Jeffrey L. Haberman
(*pro hac vice* forthcoming)
Jonathan R. Gdanski
(*pro hac vice* forthcoming)
**SCHLESINGER LAW OFFICES, P.A.**
1212 SE Third Avenue
Ft. Lauderdale, FL 33316
Telephone: 954-320-9507
Facsimile: 954-320-9509
scott@schlesingerlaw.com
jhaberman@schlesingerlaw.com
jgdanski@schlesingerlaw.com

/s/ Robert C. Gilbert
Robert C. Gilbert
(*pro hac vice* forthcoming)
gilbert@kolawyers.com
Jeffrey M. Ostrow
(*pro hac vice* forthcoming)
ostrow@kolawyers.com
Jonathan M. Streisfeld
(*pro hac vice* forthcoming)
streisfeld@kolawyers.com
Scott A. Edelsberg
(*pro hac vice* forthcoming)
edelsberg@kolawyers.com
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300

*Counsel for Plaintiffs and the Proposed Class*